**ECK MILLER TRANSPORTATION CORPORATION, Appellant,**

v.

**Jerry WAGERS; Special Fund; and Workers' Compensation Board, Appellees.**

**Vicki G. NEWBERG, Acting Director of Special Fund, Appellant,**

v.

**ECK MILLER TRANSPORTATION CORPORATION; Jerry Wagers; Thomas Shewmaker, Administrative Law Judge; and Workers' Compensation Board, Appellees.**

Nos. 91–CA–002129–WC, 91–CA–002134–WC.

Court of Appeals of Kentucky.

July 3, 1992.

Thomas L. Ferreri, Ferreri & Fogle, Lexington, for appellant Eck Miller Transp. Corp.

John E. Stephenson, Louisville, for appellant special fund.

Franklin Stivers, Stivers & Stivers, London, for appellee.

Before EMBERTON, HUDDLESTON and STUMBO, JJ.

HUDDLESTON, Judge.

Eck Miller Transportation Corporation and Kentucky's Special Fund appeal from the decision of the Workers' Compensation Board granting jurisdictional cognizance to Eck Miller employee Jerry Wagers' workers' compensation claim, reversing an Administrative Law Judge's Opinion and Order. Because we believe the ALJ's Opinion and Order were supported by substantial evidence, we reverse the Board's decision.

Jerry Wagers was initially interviewed for a job as a tractor-trailer driver for Eck Miller by an independent freight agent working for Miller at an Owensboro, Kentucky terminal. Wagers was notified in Owensboro that he had secured the job, but was sent to Miller's principal office in Rockport, Indiana, some sixteen miles away, to fill out the necessary leases and contracts. A portion of the employment contract provided that workers' compensation would be deducted from Wagers' salary.

Wagers sent all the paperwork concerning his employment and duties to a post office box in Owensboro; the documentation was picked up by a Miller employee and carried to Rockport to be processed. Wagers was required to do a substantial amount of paperwork, vehicle maintenance, and other work-related activities at his home in Kentucky. His payroll checks were processed in Rockport, but drawn on an Owensboro bank. Wagers was a resident of Kentucky during the entirety of his employment with Miller.

For one and one-half years prior to the date of his injury, Wagers received his route assignments and made his hauls from Miller's Chattanooga, Tennessee, terminal. This terminal was run by one of the many independent freight agents in Miller's nationwide network. These agents acquire the actual freight for the Miller trucks to haul, and are paid on a commission basis dependent on the amount of monthly revenue they generate.

Wagers did not indicate from whence the Miller directive originated assigning him to the Chattanooga terminal, but agreed in his deposition that he essentially received all his work orders from Chattanooga after that assignment. Prior to the Chattanooga assignment, Wagers had hauled to all forty-eight of the continental United States.

Wagers' regular route from Chattanooga ran to Ypsilanti, Michigan, passing through Kentucky and Ohio along the way. Wagers of course was required at times to depart from his normal route; it is apparent from the record that two of the last four hauls he made from Chattanooga prior to his accident were to Kentucky destinations.

Wagers was injured in August, 1988, near Clinton, Tennessee, when he leapt from his moving truck after it had caught fire. Wagers has not worked since the 1988 accident. After the accident he was paid workers' compensation benefits under Indiana law, "apparently in accordance with contracts previously executed by the parties," but those payments terminated prior to the initiation of these proceedings.

Upon the initiation of the present action and after sufficient evidence was taken, the parties agreed to submit the issue of jurisdiction to the ALJ before the question of occupational liability was broached, in order to save time and money.

KRS 342.670 governs the extraterritorial application of Kentucky's Workers' Compensation Act. The statute provides in relevant part:

**Extraterritorial coverage.**—(1) If an employe, while working outside the territorial limits of this state, suffers an injury on account of which he ... would have been entitled to the benefits provided by this chapter had such injury occurred within this state, such employe ... shall be entitled to the benefits provided by this chapter, provided that at the time of such injury:

(a) His employment is principally localized in this state, or

(b) He is working under a contract of hire made in this state in employment not principally localized in any state, or

(c) He is working under a contract of hire made in this state in employment principally localized in another state whose workers' compensation law is not applicable to his employer, or

(d) He is working under a contract of hire made in this state for employment outside the United States and Canada.

The ALJ began his jurisdictional analysis as follows:

From the four conditions noted in [KRS 342.670] Subsection 1, subparagraph (d) is immediately eliminated from consideration under the present facts since the injury occurred within the boundaries of the United States. As to subparagraph (a), the claimant's own testimony would refute his employment being principally localized in this State. Mr. Wagers testified that while in the employment of the defendant-employer he had driven throughout the 48 states and for the last year and one half had been assigned to the Chattanooga dispatcher. In order to determine if subparagraph (b) or (c) are applicable there must be an initial determination as to whether Mr. Wagers' employment was principally localized.

The ALJ correctly noted that the key to extraterritorial coverage under the statute is the determination of the situs at which an employee's work activity is "principally localized." KRS 342.670(4) defines principal locality of employment—

(d) A person's employment is principally localized in this or another state when:

1. His employer has a place of business in this or such other state and he regularly works at or from such place of business, or

2. If subparagraph 1. foregoing is not applicable, he is domiciled and spends a substantial part of his working time in the service of his employer in this or such other state.

Regarding (4)(d)(1), the ALJ noted that Miller maintains places of business in Kentucky, Tennessee, and Indiana, but determined that Wagers' assignment to the Chattanooga terminal during the one and one-half years prior to his accident resulted in his working "from" Tennessee for statutory purposes, since under *Amax Coal Co. v. Smith*, Ky.App., 748 S.W.2d 158, 160 (1988), the most recent employment must be considered in construing the statute. With this finding of Tennessee localization under (1)(a) as defined by (4)(d)(1), the ALJ did not and needed not address the remainder of the statute. This notwithstanding, the ALJ went on to state:

The evidence further indicates that [Wagers'] work related injury occurred within the boundaries of the State of Tennessee after he had left the Chattanooga terminal. There is nothing in the record to indicate that Mr. Wagers would not be able to draw benefits under the compensation law of the State of Tennessee. It is noted that he has drawn them under the laws of the State of Indiana, apparently in accordance with contracts previously executed by the parties.

IT IS HEREBY ORDERED that Kentucky does not have jurisdiction over the work related injury sustained on August 29, 1989, and that the claimant has the right to draw compensation benefits under the laws of either the State of Tennessee or Indiana.[1]

---

1. With this language the ALJ in effect embraces two competing theories of jurisdiction, neither of which would include Kentucky as a jurisdictional situs. If the extraterritorial coverage stat-

Wagers appealed the ALJ's order to the Workers' Compensation Board. The Board focused substantial attention on the Wagers–Miller contracting process, accented the amount of work Wagers did in Kentucky, and noted that Wagers was a Kentucky domiciliary. The Board offered the following analysis:

A review of the entire record indicates that the contract of hire between Wagers and Miller took place at one of Miller's places of business or agencies in Owensboro, Kentucky, and that the most recent contract was apparently sent to and signed at Wagers' Kentucky residence.

Wagers was directed to the 'steady haul' or route for loading mainly out of the Chattanooga, Tennessee, terminal by Miller. Miller's other chief points of control over and contact with Wagers in this employment relation were the required essential paperwork that was sent to an Owensboro, Kentucky address, and the payments to Wagers by checks drawn on an Owensboro bank.

The aspect of Wagers' 'regular' work that involved the transportation, loading and unloading of freight is temporary and transitory by nature, and the states through which Wagers drove and the terminals at which he loaded or unloaded are but a route he traveled. All other aspects of Wagers' employment relation with Miller that involve a particular or fixed location are chiefly and principally localized in Kentucky, and are controlled or directed by or through a 'place of business' that Miller had in Kentucky.

The ALJ found that because of the nature of the trucking business, Wagers did not work 'at' a place of business, but worked 'from' the Chattanooga, Tennessee, place of business. However, stops or points on a route [do not] constitute a 'place of business'. The place where the employment relation is actually carried on is the pertinent inquiry, in light of the duties required by the contract and the particular location of Miller's place of business involved in Wagers' performance of those duties.

Based on the above, the Board determined that the evidence contained in the record as a whole compelled a finding that Wagers' employment was principally localized in Kentucky, under KRS 342.670(1)(a), as defined by (4)(d)(1).[2] The ALJ's Opinion and Order were therefore reversed, prompting Miller and the Special Fund to undertake the present appeal.

ute dictated that Tennessee workers' compensation law should govern, then the ALJ necessarily found that Wagers' employment was principally localized in Tennessee (as the ALJ did in fact find), under KRS 342.670(1)(a); (4)(d)(1). Indiana law would only be applicable if the ALJ found that Wagers' employment was not principally localized in any state; found the situs of Wagers' renewal contract with Miller to be Indiana, or found that the initial employment contract's signing situs (Indiana) should govern; and therefore concluded under KRS 342.-670(1)(b) that the place where the employment contract was made should govern the applicable jurisdiction. The ALJ, of course, made no fact-finding that would support the Indiana jurisdiction—his findings regarding Tennessee localization would in fact preclude the further analysis which would indicate Indiana jurisdiction under KRS 342.670(1)(b)—yet the language remains.

**2.** Though the Board does not precisely detail its reasoning under the statute, its decision necessarily indicates either that the Board determined under KRS 342.670(4)(d)(1) that Wagers worked "at or from" Miller's Owensboro, Kentucky facility; or that the Board determined that (4)(d)(1) was not applicable, and therefore under (4)(d)(2) Wagers' Kentucky domicile and the substantial amount of time he worked in Kentucky required this state to take jurisdiction over his claim. It is in fact evident that the Board determined that Kentucky jurisdiction would be appropriate under KRS 342.670(1)(a) as defined by (4)(d)(1) *or* (4)(d)(2), *and* that jurisdiction would follow from the employment relationship's contractual situs (concluded to be Kentucky), under KRS 342.670(1)(b). This, of course, despite the fact that a (4)(d)(1) determination precludes consideration under (4)(d)(2) and (1)(b); that a (4)(d)(2) determination precludes consideration under (4)(d)(1) and (1)(b); and that a (1)(b) determination precludes consideration under (4)(d)(1) and (4)(d)(2). The most reasonable construction seems to be that the Board attempted to use the (4)(d)(2) and (1)(b) analyses to bolster its determination that, based on the "entire record," a finding in favor of a Kentucky localization under (1)(a) as defined by (4)(d)(1) was compelled, and therefore that Wagers worked "at or from" the Miller facility at Owensboro, Kentucky.

■ Wagers clearly bore the burden of proving by competent evidence all facts necessary to establish Kentucky jurisdiction for his claim. *Collier v. Wright*, Ky., 340 S.W.2d 597, 598 (1960). When the ALJ concluded that Kentucky jurisdiction was disallowed by statute, the Board on review could only reverse the ALJ by determining his findings to be clearly erroneous, and holding that the evidence was so overwhelming, upon consideration of the record as a whole, that it compelled a finding in Wagers' favor. *Wolf Creek Collieries v. Crum*, Ky.App., 673 S.W.2d 735, 736 (1984); KRS 342.285(2)(d).

■ Upon our review of the record, we must hold that the ALJ's findings were consonant with the evidence presented to him. It is indisputably the case that Miller assigned Wagers to work from Miller's place of business in Chattanooga, Tennessee, for the one and one-half years prior to his accident. Wagers received substantially all his work orders from Chattanooga, and was in fact in Tennessee when the accident in question occurred. Under these circumstances, the ALJ's finding under KRS 342.670(1)(a) as defined by (4)(d)(1) that Wagers worked "from" Tennessee for

statutory purposes is certainly supported by "reliable, probative, and material evidence." KRS 342.285(2)(d).

■ Although the Board goes to great lengths to chronicle the Wagers–Miller contracting process, Wagers' domiciliary, and his work in Kentucky, the entire analysis is essentially irrelevant, since it would only come into play if KRS 342.670(1)(a) as defined by (4)(d)(1) were not the appropriate standard of analysis [3]—*i.e.*, only come into play if the ALJ's findings were not supported by substantial evidence, or were incorrect as a matter of law, neither of which is the case.[4]

The decision of the Workers' Compensation Board reversing the Opinion and Order of the Administrative Law Judge is therefore reversed.

All concur.

---

**3.** See Footnote 2, *supra.*

**4.** Wagers encourages this Court to consider the holding in *Davis v. Wilson*, Ky.App., 619 S.W.2d 709 (1980). *Davis* involved an interpretation of KRS 342.670(1)(a) as defined by *(4)(d)(2)*, in a situation where (4)(d)(1) was not applicable. Since the ALJ's Opinion and Order were based on (4)(d)(1), and supported by probative and material evidence, *Davis* has no relevance to the present analysis.